UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA TELL,

              Plaintiff,                          Civil Action No. 11-cv-15071

        v.                                District Judge Mark A. Goldsmith
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 12]

      Plaintiff Angela Tell brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties filed summary judgment motions (Dkts. 9, 12), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

## I. RECOMMENDATION

      For the reasons set forth below, this Court finds that the ALJ erred in his credibility determination.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On May 20, 2009, Plaintiff filed an application for DIB and an application for SSI. (Tr. 11.) In both applications, Plaintiff asserted that she became unable to work on August 2, 2008. (*Id.*) The Commissioner initially denied Plaintiff's disability application on September 23, 2009. (*Id.*) Plaintiff then filed a request for a hearing, and on October 12, 2010, she appeared with her present counsel before Administrative Law Judge ("ALJ") Patrick J. MacLean, who considered the case *de novo*. (Tr. 11-21, 27-58.) In a January 7, 2011 decision, the ALJ found that Plaintiff was not disabled. (Tr. 11-21.) The ALJ's decision became the final decision of the Commissioner on October 4, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on November 16, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 49 years old at the time of the ALJ's decision. (Tr. 35.) She attended school through the ninth grade. (Tr. 51.) Plaintiff has limited past work experience as a babysitter. (Tr. 157, 189.)

#### 1. *Plaintiff's Testimony at the Hearing Before the ALJ*

At her October 12, 2010 hearing before ALJ MacLean, Plaintiff described symptoms stemming from her HIV infection, diabetes, and anxiety. (*See* Tr. 41.) Plaintiff said she was diagnosed with HIV 14 years ago. (Tr. 38.) When asked if her HIV condition had changed since she stopped working in August 2008, Plaintiff responded that she "started eating real light." (Tr. 42.) She described constipation and stated that her medication caused an upset stomach. (Tr. 42.) She reported a 21-pound weight loss from 158 pounds. (*Id.*) Plaintiff also testified that her HIV

2

causes thrush (sores) in her mouth.  (Tr. 47.)[1]  She acknowledged, however, that her medications helped her thrush symptoms.  (Tr. 49.)  Although Plaintiff did not directly attribute it to her HIV, she reported a "real achy feeling" from mid-thigh down to her feet.  (Tr. 47.)  Plaintiff also reported a 14-year history of vision problems, including seeing black spots.  (Tr. 40.)  It is unclear whether this was due to Plaintiff's HIV infection, her diabetes, or some other cause.  (Tr. 40.)

Plaintiff testified that her medication controlled her anxiety attacks.  (Tr. 44.)  She stated that her medication calmed her, and twice agreed with the ALJ that it stopped her anxiety attacks.  (Tr. 44, 46.)

Plaintiff lives in a home with four of her five children; four of her children are adults while the youngest is 14.  (Tr. 36.)  Plaintiff said that she does not "really lift anything" because she has grown children who "do everything for me."  (Tr. 45.)  When asked how much she could lift on a regular basis, Plaintiff replied, "probably some cereal."  (Tr. 45.)  Plaintiff said that she could sit for ten minutes, stand for five to ten minutes, and walk half a block.  (*Id.*)  She told the ALJ that her daughter helps her "get around."  (*Id.*)  She also testified that pain keeps her from sleeping well and that she is allergic to pain medication.  (Tr. 43.)  Plaintiff said that she lies down "almost all day."  (*Id.*)

### 2. *Medical Evidence*

Plaintiff went to the emergency room via ambulance on at least four occasions.  The first was on August 24, 2008.  Plaintiff reported anxiety and asthma; she stated that she felt "like something

---

[1]"Thrush appears as whitish, velvety sores in the mouth and on the tongue.  Underneath the whitish material, there is red tissue that may bleed easily.  The sores can slowly increase in number and size."  A.D.A.M. Medical Encyclopedia, *Thrush*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001650/ (last visited Jun. 21, 2012).

[was] squeezing [her] lungs." (Tr. 219.) The ER report indicated that Plaintiff's medication (unspecified) had run out. (Tr. 221.) The medical professional's impression was pleuritis, poorly controlled diabetes, and yeast vaginitis. (Tr. 222.) A chest x-ray was normal. (Tr. 224.) Plaintiff was discharged with prescriptions for Terazol (a vaginal cream), glucophage (a diabetes medication), and Tylenol 3. (Tr. 222.)

Plaintiff next went to the ER in September 2008. (Tr. 211-17.) Plaintiff reported weakness, headache, and bilateral lower-extremity and joint pain. (Tr. 212.) Plaintiff stated that she had run out of medication and did not have insurance. (Tr. 212.) Although the ER notes are mostly illegible, Plaintiff's blood sugar was measured, and it was explained that Plaintiff needed to take her medication. (Tr. 213.) Plaintiff also underwent a chest x-ray which revealed "borderline" cardiomegaly (enlarged heart). (Tr. 217.)

In November 2008, Plaintiff began treatment at The Wellness Plan's Gateway Medical Center location ("Gateway Medical"). (Tr. 241-44.) On November 7, 2008, the physician, Rhona Fingal, noted that Plaintiff had not taken her medication in two weeks. She prescribed Metoprolol (a blood pressure medication), Simvastatin (a cholesterol medication), Metformin (a diabetes medication), and Alprazolam (an anxiety and panic disorder medication). (Tr. 241.)[2]

In December 2008, Plaintiff saw Dr. Arathi Raman at Gateway Medical. (Tr. 241.) It appears that her chief complaint was that the antibiotic prescribed for her vaginitis was not effective. (*See* Tr. 241, 244.) Plaintiff was referred to a specialist for her HIV and vision, and was also referred to a gynecologist. (Tr. 241.)

---

[2]The Court consulted the PubMed Health website, a service provided by the National Center for Biotechnology Information at the U.S. National Library of Medicine, for descriptions of medications. *See generally* http://www.ncbi.nlm.nih.gov/pubmedhealth/ (last visited June 22, 2012).

On January 19, 2009, Plaintiff again went the emergency room via ambulance. (Tr. 204-10.) Plaintiff reported anxiety and that her prescribed medication, Valium, was not working. (Tr. 205, 207.) Plaintiff was given Ativan, an anxiety medication. (Tr. 247.)

On January 22, 2009, Plaintiff returned to Gateway Medical for an ER followup. (Tr. 246-49.) Dr. Raman noted that Plaintiff had been out of medication for three days. (Tr. 247.) Plaintiff stated the she was unsuccessful in getting a refill of Ativan. (Tr. 247.) Dr. Raman noted, "[patient] was noncompliant and did not follow up and needs to see the therapist again at northeast guidance center." (*Id.*) Dr. Raman prescribed several medications: Zocor (for cholesterol), Keflex (an antibiotic), Metformin (a diabetes medication), and Metoprolol (a blood pressure medication). (Tr. 249.) He also scheduled followup exams with specialists in cardiology, dietary, endocrinology, opthamology, podiatry, and psychiatry. (*Id.*)

In February 2009, Plaintiff went to the ER via ambulance for an anxiety attack. (Tr. 198-202.) Plaintiff reported that she had started a new medication, and that she needed "Ativan not that new med[ication]." (Tr. 199.) Although the handwriting is difficult to decipher, it appears that Plaintiff was given Ativan. (Tr. 203.)

Plaintiff also had a consult with an ophthalmologist in February 2009. (Tr. 257.) The physician found that Plaintiff had diabetes without retinopathy (retinal damage).

On March 2, 2009, Plaintiff went to a Wayne State University Physician Group facility ("Wayne State") to reestablish HIV care. (Tr. 231-34.) Plaintiff saw a nurse practitioner, Gerald Burns. (Tr. 234.) Burns noted that, due to insurance issues, Plaintiff was last seen in 2003. In a section of his report regarding "HIV followup," Burns noted, "NO active complaint currently." (Tr. 231.) Plaintiff reported fatigue, night sweats, and occasional thrush. (Tr. 232.) Regarding

5

Plaintiff's diabetes, Burns remarked that Plaintiff "[c]laims to have poorly controlled DM, but does not check [her capillary blood glucose] at home." (Tr. 231.) Plaintiff, who weighed 158 pounds, was negative for weight gain or loss, insomnia, and bone/joint symptoms or weakness. (Tr. 232-33.) On exam, Burns found that Plaintiff had poor oral hygiene and missing teeth. (Tr. 233.) He also found that Plaintiff had no unusual anxiety or evidence of depression. (Tr. 233.) Burns ordered laboratory tests and scheduled Plaintiff for a followup exam. (Tr. 234.)

On March 23, 2009, Plaintiff had a followup with Dr. Jonathan Cohn at Wayne State. (Tr. 235-37.) Plaintiff reported difficulty sleeping, loss of appetite, nausea, vomiting, dry throat, diarrhea and was "reluctant to take full doses of [her anxiety/depression] medication." (Tr. 235.) Dr. Cohn remarked, "She says she has all the side effects she read about!" (*Id.*) On a review of Plaintiff's systems, she was negative for fatigue, vision loss, and "bone/joint symptoms and weakness." (Tr. 236.) On exam, Dr. Cohn found that Plaintiff's extremities appeared normal. (Tr. 236.) He commented, "Patient is very anxious which she acknowledges." (Tr. 236.) Dr. Cohn restarted Plaintiff on antiretroviral therapy, advised Plaintiff to take the prescribed three doses of her diabetes medication (rather than two), and noted that her anxiety was "poorly controlled." (Tr. 237.) Plaintiff was to follow up with a therapist and the psychiatric nurse practitioner who had prescribed the anxiety medication. (Tr. 235, 237.)

On May 15, 2009, Plaintiff saw Dr. Felicia Randolph at Gateway Medical for a medication refill, a tooth infection, and cough with wheezing. (Tr. 245.) Dr. Randolph noted that Plaintiff was not on an American Diabetes Association diet and that Plaintiff did not know how to give herself insulin. (Tr. 245.) Plaintiff admitted to being hospitalized a month earlier for uncontrolled blood sugar. (*Id.*) Dr. Randolph prescribed an inhaler, Fluconazole (an anti-fungal including for yeast

6

infections), Reyataz (an HIV protease inhibitor), Mirtazapine (for depression), Albuterol (for chest-tightness and wheezing), Tylenol 3, penicillin, and Motrin.  (Tr. 246.)

In August and September 2009, physicians for the Social Security Administration and Michigan's Disability Determination Service ("DDS") assessed Plaintiff.  (Tr. 258-87.)  Dr. Shakti Kaul completed a Physical Residual Functional Capacity Assessment based on Plaintiff's medical file.  (Tr. 258-65.)  Dr Kaul found Plaintiff capable of the full range of light work.  (*Id.*)  He noted that "Claimant does have diagnosis of HIV, but currently does not have any problem due to HIV." (Tr. 265.)

On September 10, 2009, Dr. Basivi Baddigam, a psychiatrist, evaluated Plaintiff for Michigan's DDS.  (Tr. 267-69.)  Plaintiff reported having anxiety attacks at least twice a month for six years.  (Tr. 267.)  According to Plaintiff, her anxiety attacks resulted in an inability to breathe, heart palpitations, and sweating.  (*Id.*)  She also reported depression "on and off" since the death of her one-year-old child in 1983.  (*Id.*)  Dr. Baddigam remarked, however, that Plaintiff was "extremely vague" about her depression.  (*Id.*)  He also noted that Plaintiff did not appear sad or depressed.  (Tr. 268.)  Upon completing a mental-status exam, Dr. Baddigam diagnosed Plaintiff with panic disorder without agoraphobia, depressive disorder not otherwise specified, and assigned a Global Assessment Functioning score of 65.[3]

---

[3]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.

A GAF score of 61 to 70 indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful

Less than two weeks later, Dr. Jerry Csokasy reviewed Plaintiff's medical file, including Dr. Baddigam's report, and completed a Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 270-87.) On the Mental RFC Assessment, Dr. Csokasy found that Plaintiff had moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. (Tr. 270-71.) He otherwise found that Plaintiff was not significantly limited. (*Id.*) In a section titled "Functional Capacity Assessment," he concluded, "[claimant] is able to perform at least simple/routine tasks on a sustained basis." (Tr. 272.) On the PRTF, Dr. Csokasy rated Plaintiff's "B" criteria associated with certain social security mental-impairment listings as follows: mild restriction in activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 284.)

From March 2009 and well into 2010, Plaintiff went to the emergency room on a number of occasions. In March 2009, Plaintiff was seen for bronchitis and given an inhaler. (Tr. 288-89.) On October 27, 2009, Plaintiff went to the ER for an anxiety attack or "stress reaction." (Tr. 292.)

On October 30, 2009, Burns (the nurse practitioner at the Wayne State University Physician Group) completed a functional assessment. He provided that Plaintiff could stand for 60 minutes at one time and two hours in a workday but could only sit for 60 minutes in a workday. (Tr. 293.) He provided that Plaintiff could lift no weight — even though the form provided an option for lifting five pounds occasionally. (*Id.*) Burns also provided that Plaintiff could only occasionally engage in fine and gross manipulation with either hand. (*Id.*) His comment was, "[patient's] anxiety condition severely limits her ability to work." (*Id.*)

---

interpersonal relationships." *DSM-IV* at 34.

8

In November 2009, Plaintiff returned to the emergency room for hyperglycemia associated with her diabetes.  (Tr. 294.)  She also had another anxiety attack or stress reaction.  (Tr. 296.)  In December 2009 Plaintiff was seen at the ER for a stress reaction and for contact dermatitis.  (Tr. 302-08.)  Plaintiff was given Xanax for her anxiety.  (Tr. 307.)

In March 2010, Plaintiff went to the emergency room twice.  The first was for myalgias (muscle aches).  (Tr. 309.)  Plaintiff was given Difulcan (for yeast infections) and Darvocet.  (Tr. 310.)  Plaintiff's second visit was for dermatitis.  (Tr. 313.)

On March 22, 2010, Plaintiff returned to the Wayne State University Physician Group and saw Dr. Nehman Lauder.  (Tr. 318-21.)  Plaintiff reported bilateral hip, thigh, and knee pain.  (Tr. 318.)  According to Plaintiff, the pain, described as "soreness" without numbness, had been ongoing for two to three months.  (*Id.*)  On exam, Dr. Lauder found that Plaintiff's hips had full range of motion and were not tender to palpation.  (Tr. 320.)  Plaintiff's knees were tender, however, and so were her hamstrings.  (Tr. 320.)  Dr. Lauder ordered x-rays and a venous Doppler, and recommended a warm compress and elevation.  (Tr. 320-21.)

On April 12, 2010, Plaintiff returned to see Dr. Lauder.  (Tr. 322-24.)  She reported that her leg only bothered her when she took her anxiety medication.  (Tr. 322.)  On exam, Dr. Lauder found some tenderness in Plaintiff's left thigh.  (Tr. 323.)  The x-ray and Doppler studies were negative.  (*Id.*)  He prescribed a trial of Flexeril, a muscle relaxant, and noted that Plaintiff planned to speak with her psychiatrist regarding her anxiety medication.  (Tr. 323.)

The next day, Plaintiff returned to Wayne State for an HIV followup.  (Tr. 325.)  Plaintiff was reviewed by a resident and Dr. Cohn.  It was noted that Plaintiff had not yet filled her prescription for Flexeril.  (Tr. 325.)  Dr. Cohn noted that Plaintiff had poorly controlled diabetes,

9

but "rather good" HIV RNA levels (although her laboratory results were not recent).  (Tr. 327.)

In July 2010, Plaintiff went to the emergency room and was diagnosed with urethritis (swelling and irritation of the urethra) and cervicitis (swelling of the cervix).  (Tr. 331.)  A few days later, Plaintiff went to Wayne State for a followup.  (Tr. 331.)  Plaintiff reported that she was having problems swallowing both solid and liquid foods.  (Tr. 331.)  Nurse practitioner Burns referred Plaintiff to gastroenterology.  (Tr. 332.)

In August 2010, Plaintiff saw Burns for an HIV followup.  (Tr. 333-36.)  Plaintiff was concerned with her recent weight loss of ten pounds and reported fatigue, gastrointestinal problems, anxiety, and depression.  (Tr. 333-34.)  Plaintiff thought that her HIV might be worsening.  (Tr. 333.)  Burns noted that a few months earlier, in April 2010, her HIV "was . . . controlled on current treatment."  (Tr. 333.)  Regarding Plaintiff's HIV, Burns ordered additional labs and scheduled a followup in four months.  (Tr. 336.)  Regarding her diabetes, Burns remarked,

> She is not checking her [capillary blood glucose] at home and seems confused as to what [the] symptoms of hyperglycemia are.  Her uncontrolled [diabetes] can certainly explain many of her current signs and symptoms such as anorexia and [weight] loss as well as the [urinary tract infection] she was recently treated for.  I explained all of this to [patient] and review with her the importance of tight glucose control for optimal health outcomes.

(Tr. 336.)  As for Plaintiff's anxiety, Burns noted that Plaintiff was "clearly depressed and anxious regarding her multiple complaints.  Seems reassured that better control of her [diabetes] may allay many of her symptoms."  (*Id.*)

On August 12, 2010, Plaintiff went to the emergency room for weakness.  (Tr. 355.)  The emergency-room exam did not reveal the cause.  (*Id.*)  The next day, Plaintiff went to an urgent care center for a sinus infection and sore throat.  (Tr. 358.)  On August 17, 2010, Plaintiff saw Dr. Lauder

10

for mouth pain.  (Tr. 337.)  Dr. Lauder told Plaintiff that the drainage from her sinus infection was the cause of the pain.  (*Id.*)

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

At Plaintiff's administrative hearing, the ALJ asked a vocational expert ("VE") to consider hypothetical individuals with functional limitations meant to approximate Plaintiff's limitations. The ALJ first asked the VE to consider someone of Plaintiff's age, education, and work experience who is able to perform work at any exertional level but cannot climb ladders, ropes or scaffolds; can only occasionally climb ramps or stairs; can only occasionally balance, stoop, crouch, kneel and crawl; must avoid all use of moving machinery and exposure to unprotected heights; and is limited to simple, routine, and repetitive tasks.  (Tr. 52.)  The VE testified to a substantial number of jobs at the unskilled, medium exertional level that the hypothetical individual could perform.

The ALJ then asked the VE to consider a second hypothetical individual who was the same as the first except that the second individual was limited to the light exertional level.  (Tr. 53.)  The VE again testified to a substantial number of jobs that the hypothetical individual could perform.  (*Id.*)

Finally, the ALJ asked the VE to consider a third hypothetical individual who was the same as the first except that the third individual was limited to the sedentary exertional level.  The VE testified that, in the regional economy, there would be 1,500 sorter positions that the individual could perform, 3,000 bench assembler jobs, and 1,500 order clerk jobs.  (Tr. 54.)

Plaintiff's counsel then asked the VE whether someone missing six to eight hours of work per week for medical appointments could work.  (Tr. 56.)  The VE provided that such a person would be precluded from work.  (*Id.*)

11

## C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

12

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 2, 2008 — Plaintiff's alleged onset date.  (Tr. 13.)  At step two, the ALJ found that Plaintiff had the following severe impairments: panic disorder without agoraphobia; depressive disorder, not otherwise specified (NOS); and non-insulin dependent diabetes mellitus.  (Tr. 14.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (*Id.*)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds; can occasionally climb ramps/stairs, balance, stoop, crouch, kneel, and crawl; and should avoid all use of moving machinery and exposure to unprotected heights. The claimant requires simple, routine, and repetitive tasks.

(Tr. 16.)  At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 19.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: packer, sorter, and small product assembler.  (Tr. 20.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc.*

14

*Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff raises several claims of error on appeal.  Although none are well developed, the Court finds that Plaintiff's claim that the ALJ did not adequately explain his credibility assessment warrants remand.  Accordingly, the Court begins there.

### 1. The ALJ Did Not Adequately Explain His Credibility Assessment

Although made as part of a larger argument regarding the ALJ's residual functional capacity assessment, Plaintiff argues that the ALJ erred in discounting her credibility.  (Pl.'s Mot. Summ. J. at 15.)  In particular, Plaintiff argues:

> In *Varley v Secretary of HHS*, 820 F.2d, 777, 779 (6th Circuit 1987), the court stated that the RFC assessment must accurately portray the claimant's physical and mental impairments. [ALJ] MacLean does not factor in his RFC determination his own previous conclusion that Ms. Tell suffers from depression, nor does he factor Plaintiff's moderate difficulties with maintaining social functioning.  There is not a scintilla of evidence to support his RFC assessment that Ms. Tell would be capable of work at all exertional levels including work that requires lifting up to 100 pounds with frequent lifting of 50 pounds on a sustained basis considering the above even with the limitations the ALJ listed in the RFC.  The ALJ never factors or even attempts to factor Ms. Tell's panic disorder in his RFC determination. The ALJ never attempts to factor Ms. Tell's numerous problems including fatigue, anxiety, panic attacks, or pain into his RFC findings.  The ALJ never factors Ms. Tell's need to lie down and her severe weight loss in his RFC findings. *The ALJ states that he does*

15

> *not find claimant credible; however, the ALJ never discusses or evaluates Ms. Tells subjective complaints under 20 CFR 416.929(c). Such factors as medication side effects, daily activities, and pain symptoms are never discussed in the ALJ decision.  The ALJ just makes blanket statements dismissing the complaints of Ms. Tell.*

(Pl.'s Mot. Summ. J. at 15 (emphasis added).)[4]

The ALJ's narrative, insofar as it discusses Plaintiff's credibility, provides:

> The claimant testified that she has HIV with ongoing associated problems, diabetes, hypertension, eye problems, digestive problems, and bronchitis. The claimant stated that because of her condition she is weak and has pain, she has to lie down, she has required surgery on her mouth, and she has lost weight. She reported that she is allergic to pain medication, and has anxiety and depression with crying spells. The claimant testified that she lives with four of her children, ages 25, 21,18, and 14; and that her youngest child is still in school. She reported that her daughter helps her take care of her youngest child, who is a special education student.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 16-17.)  Later in his narrative, the ALJ added, "The undersigned has considered the claimant's allegations and has found them inconsistent with the objective medical findings in the record.  The claimant's testimony is not well supported by the objective medical evidence in the record and therefore not entitled to significant weight."  (Tr. 19.)

As an initial matter, the Court finds that the boilerplate language commonly found in ALJ

---

[4]To the extent that the Commissioner would object that Plaintiff has not raised a credibility argument, that claim would be in tension with the Commissioner's Motion for Summary Judgment which addresses Plaintiff's credibility argument.  (Def.'s Mot. Summ. J. at 8.)

opinions to be unhelpful.  Essentially it says that all the claimant's allegations are not credible to the extent they are more severe than the RFC.  This does not aid the Court; implicit in the ALJ's decision is that the evidence supports the RFC determination and that the claimant can work.  On the other hand, the claimant's allegations almost always set forth limitations beyond the RFC or are otherwise consistent with disability.  As the Seventh Circuit has recently reiterated:

> Reading the administrative law judge's opinion, we first stubbed our toe on a piece of opaque boilerplate near the beginning, where, after reciting Bjornson's description of her medical condition, the opinion states: "After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The government's brief describes this passage as a "template," by which it means a passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains.

> This "template" is a variant of one that this court (and not only this court) had criticized previously—that "after considering the evidence of record, the undersigned finds that claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." In *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), we called this "meaningless boilerplate. The statement by a trier of fact that a witness's testimony is 'not entirely credible' yields no clue to what weight the trier of fact gave the testimony" (emphasis in original); *see also Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010). "Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.  More troubling, it appears that the Commissioner has repeatedly been using this same boilerplate paragraph to reject the testimony of numerous claimants, without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at

17

> hand, almost without regard to whether the boilerplate paragraph has any relevance to the case." *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (citation omitted).

*Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012).

The remainder of the ALJ's credibility analysis is beyond any meaningful appellate review and does not comply with the applicable Social Security Regulations and Rulings on how credibility should be analyzed. As an initial matter, the ALJ did not even identify which of Plaintiff's statements he found not credible. More troubling, however, the ALJ did not provide a good explanation for why particular testimony was not credible. The best the ALJ did in this regard was to provide that "[t]he medical records [do] not support the claimant's allegations of limitations" (Tr. 17), and then proceeded to discuss the medical records, (Tr. 17-19). But an ALJ must not reject a claimant's "statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. In fact, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724,

733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  S.S.R. 96-7p, 1996 WL 374186 at *2.

A recent decision from a court in this District is also instructive:

> The ALJ acknowledged Christephore's complaints, including his fatigue, need to nap throughout the day, back and leg pain, frequent use of the bathroom, skin lesions and infections, thrush, and anxiety, as well as the side effects of his HIV medication, such as drowsiness, headaches, stomach aches, and diarrhea.  However, he found that Christephore's testimony about the limiting effects of these problems was not completely credible in light of his daily activities and the objective medical findings. . . .

> The Magistrate Judge sets forth the six factors ALJs are to consider when disability claimants complain of symptoms that "suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). . . . The Magistrate says, "I suggest that the ALJ considered the appropriate factors when he found that Plaintiff was not entirely credible."

> The Court is uncertain how the Magistrate arrives at this suggestion. The ALJ's decision is wholly lacking in the type of detail required by § 404.1529(c)(3).  While the ALJ acknowledges Christephore's complaints that, if credible, would severely restrict his ability to work — such as an inability to lift more than five pounds without pain, an inability to walk more than one block before his pain became unbearable, and severe fatigue and drowsiness from HIV medications that make it extremely difficult for him to concentrate and stay awake throughout the day—he fails to discuss these complaints in any meaningful way and to give specific reasons for finding them incredible.   The ALJ's conclusory assertion that "Claimant's allegations have been considered and found inconsistent with the objective medical findings in the record," (Tr. 17) is beyond meaningful review.  The ALJ does not mention the § 404.1529(c)(3) factors *and when the Magistrate Judge did so for him (albeit without any evaluation), the Magistrate Judge improperly stepped into the shoes of the ALJ.*  It is not this Court's job to review the Magistrate Judge's credibility assessment.  The ALJ must make that assessment

> in the first instance, and the Court must review the *ALJ's* credibility
> determination.  Because the ALJ failed to follow the social security
> regulations and failed to adequately explain his credibility
> determination, he must revisit that determination on remand.

*Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328, at *10-11 (E.D. Mich. June 18, 2012) (some internal citations omitted, first emphasis added).

In this case, as in *Christephore*, the ALJ rejected Plaintiff's testimony because, according to the ALJ, it was "inconsistent with the objective medical findings in the record.  The claimant's testimony is not well supported by the objective medical evidence in the record and therefore not entitled to significant weight." (Tr. 19.)  This does not comply with S.S.R. 96-7p.  Moreover, the ALJ's error is not necessarily harmless.  The Claimant testified, among other things, that "[because] I need surgery done on my mouth[,] . . . I can barely talk." (Tr. 37.)  She said she can sit or stand for no more than ten minutes before lying down and that she lays down almost all day. (Tr. 45.)  Plaintiff's pain was described as a "real achy" feeling from her thigh all the way down to her feet. (Tr. 47.)  She also described gas pain. (Tr. 48.)  Remand is warranted.

Although this Court recommends remand, it will proceed to analyze the remainder of Plaintiff's claims of error — based on the *present* administrative record — because (1) the ALJ may reaffirm (with explanation) his credibility analysis on remand, and (2) District Judge Mark A. Goldsmith may disagree with this Court's credibility analysis.

### 2. *The ALJ Did Not Ignore Certain Medical Records*

Plaintiff argues that "The ALJ ignores the medical reports found at [Exhibit] 18F and never evaluates them in anyway satisfactorily.  There is never an evaluation of Plaintiff's HIV, pain, fatigue, or any other documented symptoms discussed in 18F.  It is all ignored by the ALJ in his decision." (Pl.'s Mot. Summ. J. at 13 (internal citation omitted).)

Plaintiff is mistaken.  The ALJ considered — and discussed at some length — the evidence at Exhibit 18F of the record.  (Tr. 18.)  In fact, the ALJ explicitly discussed a record in Exhibit 18F that tends to undermine Plaintiff's implication that she experienced a multitude of symptoms attributable to her HIV or that her then-current symptoms were disabling long-term: "[Ms. Tell's] uncontrolled [diabetes] can certainly explain many of her current signs and symptoms such as anorexia and [weight] loss as well as the [uriniary tract infection] she was recently treated for."  (Tr. 336; *see also* Tr. 18 (ALJ citing Tr. 336).)  The Court finds no reversible error in the ALJ's treatment of the record evidence at Exhibit 18F.

### 3.   Given the Present Administrative Record, The ALJ Did Not Reversibly Err in Finding that Plaintiff's HIV Was Not a Severe Impairment

Plaintiff claims that the ALJ erred at step two in deciding that Plaintiff's HIV was not a severe impairment.  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988) (emphasis added) (citing *Farris v. Sec'y of Health and Human Serv.*, 773 F.2d 85, 89-90 (6th Cir.1985)).  According to Plaintiff,

> the ALJ had no basis whatsoever for not finding HIV as severe impairments.  The only thing he points to . . . his conclusion[] is that Ms. Tell reported on March 2, 2009, that [she had] "no active complaints."  Again, the ALJ takes [a] single sentence[] out of voluminous medical records to make insignificant points.  The ALJ does not evaluate the medical records as a whole.  The fact that AIDS causes multiple problems over the longitudinal record was never considered by the ALJ.  AIDS is especially difficult for women which involves numerous infections.  The medical records cannot be read in single sentences and out of context.  AIDS medications are especially toxic to the body and cause numerous side effects including; lethargic, nausea, diarrhea, muscle weakness and pain, fatigue, dizziness, headaches and numerous other problems associated with these.  The ALJ never considers the heavy medications taken by Ms. Tell in his decision as required under SSA

21

> rules and regulations.  The claimant has had recurring vaginal candidiasis, night sweats, weight loss, fatigue, malaise, mouth sores, and rhinorrea.  The ALJ clearly did not understand the complexity of an AIDS diagnosis nor understand the special factors of a woman living with an AIDS diagnosis.

(Pl.'s Mot. Summ. J. at 16-17 (internal citations omitted).)

Plaintiff speaks in generalities.  She may be correct that AIDS is "especially difficult for women."  (*Id.*)  It may also be the case that "AIDS medications are especially toxic to the body and cause numerous side effects."  (*Id.*)  The ALJ, however, correctly focused on the particulars of this case.  And upon a review of the particulars, the Court finds no reversible error in the ALJ's analysis of Plaintiff's HIV.

As an initial matter, substantial evidence supports the ALJ's conclusion that Plaintiff's HIV was not a severe impairment.  The ALJ correctly noted that in March 2009 Plaintiff reported that she had no active complaints regarding her HIV.  (Tr. 17, 231.)  The ALJ also noted that in March 2009 Plaintiff's CD4 count was 340 and in April 2010 it was 495.  (Tr. 17-18.)[5]  In August 2009, Dr. Kaul, a Michigan DDS physician, concluded, "Claimant does have diagnosis of HIV, but currently does not have any problem due to HIV."  (Tr. 265.)  In August 2010, Plaintiff reported fatigue, weakness, and weight loss and believed that her HIV was worsening.  (Tr. 333.)  Yet Burns noted that Plaintiff's HIV testing from a few months prior showed that the disease was controlled,

---

[5]Although a normal CD4 count ranges from 500 to 1,000 cells/mm3, "[t]he guidelines from the U.S. Department of Health and Human Services suggest starting treatment when [the] CD4 count falls to 350 cells/mm3 or below.  This is because opportunistic infections typically begin to affect people whose CD4 counts are below that level."  ADIS.gov, *Understand Your Test Results: CD4 Count*, http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last visited June 25, 2012).  A CD4 count below "200 cells/mm3 is one of the qualifications for a diagnosis of AIDS."  *Id.*  A "CD4 count can vary from day to day.  It can also vary depending on the time of day your blood is drawn and on whether you have other infections or illnesses, like the flu or STDs."  *Id.*

and suggested that Plaintiff's symptoms were related to her diabetes.  (Tr. 336.)  As for medication side effects, in March 2009 Plaintiff reported side effects of difficulty sleeping, loss of appetite, nausea, vomiting, dry throat, and diarrhea; but Plaintiff attributed these side effects to her anxiety/depression medication — not her HIV medication.   (Tr. 235.)  Similarly, in March 2010, Dr. Lauder noted that other physicians believed that Plaintiff's bilateral lower-extremity pain was not due to her HIV medications.  (Tr. 318.)  In fact, in April 2010, Plaintiff reported that her lower-extremity pain occurred when she took her anxiety medication.  (Tr. 322.)  Given the foregoing, substantial evidence supports the ALJ's step-two conclusion that Plaintiff's HIV had only a "minimal effect on the claimant's ability to do basic work activities."  (Tr. 14.)

Second, even if the ALJ erred by not finding Plaintiff's HIV a severe impairment, *see Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008) ("In this circuit, the claimant's burden of proof at step two 'has been construed as a de minimis hurdle in the disability determination process'"), Plaintiff has not shown how the ALJ's error warrants remand or reversal.  In particular, it is not harmful error for an ALJ to exclude an impairment as severe at step two if the ALJ finds other severe impairments and then considers the excluded impairment at subsequent steps of the disability process.  *See Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006) ("Even assuming that the ALJ erred by not including 'Borderline Intellectual Functioning' and 'Dependent Personality Disorder' as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity."); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006).  In this case, the ALJ considered whether Plaintiff's HIV met a listing at step three.  (Tr. 14.)

23

Plaintiff does not challenge the ALJ's step-three conclusion.  Next, in developing Plaintiff's RFC between steps three and four of the five-step process, the ALJ discussed many, if not all, of the medical records and symptoms Plaintiff alleges are attributable to her HIV.  (Tr. 17-18.)

And even accepting that the symptoms Plaintiff alleges – "vaginal candidiasis, night sweats, weight loss, fatigue, malaise, mouth sores, and rhinorrea" (Pl.'s Mot. Summ. J. at 16-17) – are attributable to her HIV, the ALJ reasonably concluded that these symptoms did not preclude a restricted range of light or sedentary work (as set forth in the ALJ's hypotheticals to the VE).  In particular, Plaintiff was prescribed medication to manage her vaginal candidiasis and the symptoms appeared relatively infrequently.  (Tr. 222 (August 2008), Tr. 241, 244 (December 2008), Tr. 330 (June 2010), Tr. 331 (July 2010).)  Plaintiff testified that medication helps her mouth sores.  (Tr. 49.)  Plaintiff's rhinorrea appears related to a sinus infection and nothing in the record suggests that it was long-term or recurring.  (Tr. 337, 358.)  As for Plaintiff's weight loss, fatigue, and malaise, nothing about these symptoms are inherently preclusive of a restricted range of light or sedentary work.[6]  Plaintiff's weight loss was not over an extended period: it was first reported in August 2010 and Plaintiff's weight at the October 2010 hearing was still 137 pounds (down 21 pounds from 158). (Tr. 42, 333-34.)  Regarding fatigue, a State DDS physician found that while Plaintiff "may have some difficulty walking long distances or lifting heavy things due to fatigue (tiredness) associated with her medication side effects, uncontrolled diabetes or deconditioning" she was able to perform a full range of light work.  (Tr. 263, *see also* Tr. 258-65.)  In sum, substantial evidence in the present administrative record supports the ALJ's RFC even in view of Plaintiff's claimed HIV-related

_____

[6]Although the ALJ's RFC assessment did not limit Plaintiff to light or sedentary exertion, the hypotheticals the ALJ provided to the VE did.  This is discussed in greater detail in Part II.F.5 of this Report and Recommendation.

symptoms.

### 4.  *The ALJ Did Not Violate the Treating-Source Rule*

Plaintiff claims that the ALJ "dismisse[d] the objective medical opinions of treating physicians without any rationale."  (Dkt. 9, Pl.'s Mot. Summ. J. at 12.)  Plaintiff spends several pages of her brief focused on the treating-source rule and the ALJ's alleged non-compliance with that rule.  (*Id.* at 10-13.)  Problematically, however, Plaintiff never identifies who she believes was her treating source, and moreover, which opinion the ALJ allegedly evaluated incorrectly.

As summarized at length above, Plaintiff saw a number of different physicians.  But the only physicians Plaintiff visited with enough regularity to even arguably be considered treating sources were Drs. Cohn and Lauder.  *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 506-07 (6th Cir. 2006).  But neither physician offered any "medical opinion."  *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("20 C.F.R. § 404.1527(a)(2) defines medical opinions as assertions involving *judgments about a patient's 'symptoms, diagnosis and prognosis.'*" (emphasis added)); *Bieschke v. Comm'r of Soc. Sec.*, 1:07-CV-1125, 2009 WL 735077, at *2 (W.D. Mich. Mar. 12, 2009) ("The Magistrate correctly concluded that these statements by Dr. Kornoelje do not constitute a medical 'opinion' under the applicable regulation because his statements do not reflect any judgment about the nature of Plaintiff's impairments or articulate any limitations on her ability to function.").

To the extent that Plaintiff relies on Burn's October 30, 2009 opinion, Burns was a nurse practitioner.  The regulations do not include nurse practitioners as acceptable medical sources:

> The term "treating source" is a legal term of art defined in the regulations.  "Treating source" is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  "Acceptable medical source" in turn is defined

25

in the regulations via specific enumeration of five such sources. 20 C.F.R. § 404.1502 ("Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments."); *id.* § 404.1513(a) ("acceptable medical source" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). Nurse practitioners, however, are absent from the definition of "acceptable medical source."

*Hatfield v. Astrue*, 3:07-CV-242, 2008 WL 2437673, at *1 (E.D. Tenn. June 13, 2008). And only opinions authored by acceptable medical sources trigger the treating-source rule. *See id.* at *2 ("Accordingly, the first major flaw in plaintiff's argument is that a nurse practitioner is not a treating source accorded such controlling weight.").

The Court acknowledges that the ALJ was still required to consider Burn's opinion and "should" have explained the weight he assigned to his opinion. *See* S.S.R. 06-03p, 2006 WL 2329939, at *3. But the ALJ adequately did so. He provided, "The undersigned attributes no weight to this opinion as it is based on the claimant's subjective complaints, is not consistent with the medical record as a whole, and is not supported by Dr. Cohn's own objective clinical or laboratory findings." (Tr. 18.) These rationales are supported by substantial evidence.

Based on the administrative record, Plaintiff saw Burns and Dr. Cohn for the first time in March 2009. (Tr. 231-34.) Plaintiff reported fatigue, night sweats, and occasional thrush to Burns. (Tr. 232.) Plaintiff reported difficulty sleeping, nausea, vomiting, and diarrhea to Dr. Cohn; but these symptoms were attributed to her then-prescribed anxiety medication. Dr. Cohn found that Plaintiff was negative for fatigue, vision loss, and "bone/joint symptoms and weakness"; her upper extremities appeared normal. (Tr. 236.) It then appears that Plaintiff did not see Burns or Dr. Cohn again before Burns completed the functional assessment on October 30, 2009. Yet, strikingly, that opinion provides that Plaintiff could not even lift five pounds on an occasional basis. (Tr. 293.) It

also inexplicably provides that Plaintiff had manipulative limitations with her hands.  (*Id.*)  The ALJ therefore reasonably concluded that Burns' limitations were not supported by Plaintiff's history of treatment with Dr. Cohn and Burns.  Regarding Burn's statement that Plaintiff's anxiety severely limited her ability to work, Burns was not a psychiatrist, psychologist, or even a therapist.  Moreover, as the ALJ concluded, Burns' conclusion regarding Plaintiff's anxiety appears to be based solely on Plaintiff's self-reporting.  In fact, in March 2009, Burns noted that Plaintiff had no unusual anxiety or evidence of depression.  (Tr. 232-33.)

In short, the Court finds no violation of the treating-source rule in this case.

### 5. Given the Present Administrative Record, the ALJ's Residual Functional Capacity Assessment is Supported by Substantial Evidence

Plaintiff next raises two arguments regarding the ALJ's residual functional capacity assessment of Plaintiff.  Plaintiff first says that the ALJ erred in finding that Plaintiff could perform work at all exertional levels, including the "heavy" exertional level.  (Pl.'s Mot. Summ. J. at 14.) Plaintiff points out that the heavy exertional level involves lifting 100 pounds at a time and frequently lifting objects that weigh 50 pounds.  (*Id.*)  It is true that the ALJ's RFC assessment does not limit Plaintiff to any particular exertional level.  (Tr. 16.)  And the Court agrees that, given the record evidence, Plaintiff may not be able to perform the demands of heavy work.  The problem with Plaintiff's argument, however, is that Plaintiff has not shown how the ALJ's (presumably) erroneous RFC assessment affected his ultimate disability determination.  In particular, the ALJ solicited VE testimony matching the limitations in his RFC assessment but with lower — light, and even sedentary — exertional levels.  (Tr. 52-56.)  The VE testified that there were significant jobs in the regional economy at both exertional levels.  (Tr. 53-54.)  And the ALJ explicitly relied on the VE's testimony regarding jobs available at the light exertional level in making his disability

determination. (Tr. 20.) The Court therefore finds no reversible error in the ALJ's failure to limit

the exertional level in Plaintiff's RFC assessment to light (or even sedentary) work.

Plaintiff also argues that the ALJ's RFC assessment was inaccurate because he did not

adequately account for Plaintiff's mental impairments. (Pl.'s Mot. Summ. J. at 14.) More

specifically, Plaintiff argues,

> One would be hard-pressed to find a position that Plaintiff could
> perform based on the ALJ's physical and mental severe impairment
> findings of panic disorder, depression and that she has moderate
> difficulties in social functioning. The record is consistent in
> describing the serious physical and mental problems she has had for
> years.

(Pl.'s Mot. Summ. J. at 15.)

Although the ALJ might have included additional mental limitations in his RFC assessment

of Plaintiff, substantial evidence supports his decision to go only so far as "simple, routine, and

repetitive tasks." Based on a review of the present administrative record, it appears that Plaintiff's

anxiety and associated panic attacks were the most debilitating of her mental impairments. Indeed,

Plaintiff went to the emergency room on multiple occasions for panic attacks. But, while the

medical evidence extends through August 2010, the last such visit reflected in the record was in

November 2009. (Tr. 294.) Further, at her October 2010 administrative hearing, Plaintiff testified

that medication calmed her and controlled her anxiety. (Tr. 44, 46.) She also twice agreed with the

ALJ that the medication stopped her anxiety attacks. (Tr. 44, 46.) Moreover, even in September

2009, she reported that she was having anxiety attacks only two times per month. (Tr. 267.) And

while her reported anxiety-attack symptoms were severe, Plaintiff did not say how long the attacks

typically lasted. Given the foregoing, it was not unreasonable for the ALJ to conclude that

Plaintiff's anxiety precluded work or prevented Plaintiff from performing "simple, routine, and

28

repetitive tasks."

As for Plaintiff's depression, in March 2009, Burns found that there was no evidence of depression. (Tr. 233.) Dr. Baddigam, the State DDS examiner, found that Plaintiff was "extremely vague" about her depression. (*Id.*) He also noted that Plaintiff did not appear sad or depressed. (Tr. 268.) In August 2010, Burns noted that Plaintiff was "clearly depressed and anxious regarding her multiple complaints." (Tr. 336.) But he also provided that Plaintiff "[s]eem[ed] reassured that better control of her [diabetes] may allay many of her symptoms." (*Id.*) In all, substantial evidence supports the ALJ's conclusion that Plaintiff's depression did not preclude her from performing "simple, routine, and repetitive tasks."

Finally, Plaintiff implies that the ALJ erred in failing to include specific limitations corresponding to her moderate difficulties in social functioning in her RFC assessment. (Pl.'s Mot. Summ. J. at 15.) But the ALJ, in rating the "B" criteria at step three of the five-step disability determination process, reached this conclusion by crediting Plaintiff's anxiety symptoms. (Tr. 15.) The Court has already concluded that the ALJ reasonably determined that those symptoms did not preclude simple, routine, and repetitive work. Moreover, Dr. Csokasy, who reviewed Plaintiff's file for Michigan's DDS, found that while Plaintiff was moderately limited in her ability to "interact appropriately with the general public," she was "able to perform at least simple/routine tasks on a sustained basis." (Tr. 270-72.) The ALJ also appeared to rely on the fact that Plaintiff's self-completed function report provides that she shops twice a month and enjoys talking to people in person and on the phone. (Tr. 173; *see* Tr. 15 (citing Exhibit 4E).) Plaintiff points to no physician who attributed any particular functional limitations to her moderate difficulties in social functioning. Given the foregoing, the ALJ reasonably omitted specific social-functioning limitations in his RFC

assessment of Plaintiff.

In sum, the Court finds that while additional functional limitations might have been supported by the present record, the ALJ crafted a reasonable RFC assessment.

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ erred in his credibility determination. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).



s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 13, 2012


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 13, 2012.


s/Jane Johnson
Deputy Clerk